**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS**

JOHN H. DAVIS, JR.,

Plaintiff,

v.

COMMONWEALTH ELECTION COMMISSION; FRANCES M. SABLAN, Chairperson of Commonwealth Election Commission; ROBERT A. GUERRERO, Executive Director of Commonwealth Election Commission; and BENIGNO R. FITIAL, CNMI Governor,

Defendants.

Case No.: 1-12-CV-00001

MEMORANDUM DECISION AND ORDER OF DISMISSAL WITHOUT PREJUDICE FOR LACK OF SUBJECT MATTER JURISDICTION

## I. INTRODUCTION

Plaintiff John H. Davis, Jr. ("Davis") asks the Court to permanently enjoin the chairperson and the executive director of the Commonwealth Election Commission ("CEC" or "the Commission") from denying him the right to vote on any initiative to amend or repeal Article XII of the Constitution of the Commonwealth of the Northern Mariana Islands ("Commonwealth" or "CNMI"). Article XII restricts ownership of permanent and long-term interests in real property within the Commonwealth to persons of Northern Marianas descent

("NMD").[1] In 1999, Article XVIII of the Commonwealth constitution was amended to prohibit non-NMDs who otherwise are qualified voters from voting on initiatives to change Article XII. In 2011, Governor Benigno R. Fitial signed Public Law ("P.L.") 17-40, which directed CEC to maintain a registry of NMDs. The Commission has promulgated rules and regulations to implement P.L. 17-40.

Davis, a non-NMD who is otherwise qualified to vote in the Commonwealth, asserts that by enforcing Article XVIII § 5(c) and P.L. 17-40 to restrict his right to vote, Defendants violate his civil rights as guaranteed by the Fourteenth and Fifteenth Amendments of the United States Constitution. He claims for injunctive relief under 42 U.S.C. §§ 1971 and 1983, in the form of a declaratory judgment pursuant to 28 U.S.C. § 2201 and 2202 (Declaratory Judgment Act). Defendants Frances M. Sablan, Chairperson of CEC; Robert A. Guerrero, Executive Director of CEC; and Benigno R. Fitial, Governor of the CNMI (collectively "Defendants"), maintain that the federal constitutional protections do not apply in this instance or, alternatively, that the challenged Commonwealth laws do not violate Davis's federal constitutional rights. Defendants also assert that the case must be dismissed because Davis lacks standing and the issue is not ripe for adjudication. For the reasons stated below, the Court finds that Davis lacks standing and the matter is not ripe for decision, and dismisses the case without reaching the merits.

## II. BACKGROUND

Even though the merits of the case will not be considered, a thorough review of the background is necessary to understand why the case, in its current posture, must be dismissed.

### A. Land Alienation Restrictions

On February 15, 1975, representatives of the United States and the Northern Mariana

---

[1] The constitutionality of Article XII has been affirmed, *see Wabol v. Villacrusis*, 958 F.2d 1450 (9th Cir. 1992), and is not at issue in this case.

Islands signed the Covenant to Establish a Commonwealth of the Northern Marianas Islands in Political Union with the United States of America ("Covenant"). The Covenant was approved by the Mariana Islands District Legislature and by Northern Marianas voters in a plebescite, and then was ratified by the Congress of the United States on March 24, 1976. P.L. 94-241; 90 Stat. 263, *codified at* 48 U.S.C. § 1801 note.

Section 805 of the Covenant "provides that, notwithstanding federal law, the Commonwealth government shall regulate the alienation of local land to restrict the acquisition of long-term interests to persons of Northern Mariana Island descent." *Wabol v. Villacrusis*, 958 F.2d 1450, 1452 (9th Cir. 1992). The text of Section 805 reads, in pertinent part:

> . . . notwithstanding the other provisions of this Covenant, or those provisions of the Constitution, treaties or laws of the United States applicable to the Northern Mariana Islands, *the Government of the Northern Mariana Islands*, in view of the importance of the ownership of land for the culture and traditions of the people of the Northern Mariana Islands, and in order to protect them against exploitation and to promote their economic advancement and self-sufficiency . . . will until twenty-five years after the termination of the Trusteeship Agreement, and may thereafter, regulate the alienation of permanent and long-term interests in real property so as to restrict the acquisition of such interests to persons of Northern Mariana Islands descent[.] (emphasis added)

Section 501(a) of the Covenant makes the Fifteenth Amendment and section 1 of the Fourteenth Amendment of the United States Constitution applicable within the CNMI. The Fourteenth Amendment declares that it is unlawful for any state to "deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. The Fifteenth Amendment protects the right to vote: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude."

The framers of the Covenant understood that the land alienation restrictions of Section

805 may conflict with certain federally guaranteed rights. They wished "to make clear that under no circumstances can anything in Section 501 or, for that matter, any provision in the Covenant, have the effect of prohibiting the local government from imposing land alienation restrictions under Section 805[.]" Marianas Political Status Commission, *Section by Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands* 47 (1975). They therefore expressly stated in the Covenant that the applicability of federal laws is "without prejudice to the validity of and the power of the Congress of the United States to consent to . . . Section 805 . . ." Covenant § 501(b).

Article XII of the Commonwealth Constitution implements Covenant § 805. *See Wabol*, 958 F.2d at 1452. It restricts the "acquisition of permanent and long-term interests in real property within the Commonwealth . . . to persons of Northern Marianas descent." N.M.I. Const. art. XII § 1. Section 4 of Article XII defines a person of Northern Marianas descent as

> a person who is a citizen or national of the United States and who is of at least one-quarter Northern Marianas Chamorro or Northern Marianas Carolinian blood or a combination thereof or an adopted child of a person of Northern Marianas descent if adopted while under the age of eighteen years. For purposes of determining Northern Marianas descent, a person shall be considered to be a full-blooded Northern Marianas Chamorro or Northern Marianas Carolinian if that person was born or domiciled in the Northern Mariana Islands by 1950 and was a citizen of the Trust Territory of the Pacific Islands before the termination of the Trusteeship with respect to the Commonwealth.

In 1992, the Ninth Circuit was called upon to determine "whether the constitutional guarantee of equal protection of the laws limits the ability of the United States and the Commonwealth to impose race-based restrictions on the acquisition of permanent and long-term interests in Commonwealth land." *Wabol*, 958 F.2d at 1451. The court held that under the territories clause (U.S. Const. art. IV § 3), Congress had the power to exclude Covenant § 805 from the reach of the Fourteenth Amendment's equal protection clause. *Id.* at 1462. It observed that only "fundamental" constitutional rights necessarily apply in the territories. *Id.* at 1459. It

found that "the asserted constitutional guarantee against discrimination in the acquisition of long-term interests in land" was not fundamental in the international sense and therefore could be excluded from operation in the CNMI. *Id.* at 1460, 1462.

B. Amendment of Article XII

In 1947, the United States entered into an agreement with the United Nations to administer in trust the Northern Marianas and other Pacific islands formerly mandated to Japan. *See id.* at 1458. The Trusteeship Agreement was terminated by presidential proclamation on November 3, 1986. Proclamation No. 5564, 51 Fed. Reg. 40,399 (Nov. 7, 1986). Section 805 of the Covenant mandated that restrictions on alienation of permanent and long-term interests in land remain in place until at least 25 years after the termination of the Trusteeship Agreement. Thus, since November 2011, the Commonwealth has had the power, in conformity with Section 805, to amend its constitution so as to modify or repeal the land alienation restrictions of Article XII.

Amendments to the Commonwealth Constitution "may be proposed by constitutional convention, legislative initiative or popular initiative." N.M.I. Const. art. XVIII § 1. By act of the legislature or by initiative petition, the question of whether to hold a constitutional convention to propose amendments to the Constitution may be submitted to the voters. *Id.* § 2(a),(b). Alternatively, specific amendments may be proposed by initiative petition, "signed by at least fifty percent of the persons qualified to vote in the Commonwealth and at least twenty-five percent of the persons qualified to vote in each senatorial district." *Id.* § 4(a). All proposed constitutional amendments, after certification by the Commonwealth's attorney general, must be "submitted to the Commission not more than one hundred twenty (120) days and not less than

ninety (90) days before the day of the election." 1 CMC § 6351. Ratification of a proposed amendment requires approval "by a majority of the votes cast." N.M.I. Const. art. XVIII § 5(b).[2]

C. Voter Eligibility

Article VII of the Commonwealth Constitution sets forth the qualifications of voters.[3] Any U.S. citizen or national who on the date of the election is at least 18 years of age, a resident and domiciliary of the Commonwealth for the statutorily provided period, and not serving a felony sentence or of unsound mind, is eligible to vote. N.M.I. Const. art. VII § 1.

In 1999, voters approved Senate Legislative Initiative 11-1, which proposed to amend Section 5 of Article XVIII by adding a new subsection. Subsection *c* reads:

> In the case of a proposed amendment to Article XII of this Constitution, the word "voters" as used in subsection 5(a) above shall be limited to eligible voters under Article VII who are also persons of Northern Marianas descent as described in Article XII, Section 4, and the term "votes cast" as used in subsection 5(b) shall mean the votes cast by such voters.

On April 21, 2011, Governor Benigno R. Fitial signed into law House Bill 17-57, HD1. The new law, P.L. 17-40, established a Northern Marianas Descent Registry ("NMDR") within the Commonwealth Election Commission and mandated the production of an Official Northern Marianas Descent Identification Card "that will be issued only to persons who are qualified pursuant to Article XII, § 4 of the Northern Mariana Islands Constitution." P.L. 17-40 § 2. The executive director of CEC is tasked with managing the "registry and activities of the NMDR." *Id.* § 2(b). The primary purpose of the NMDR is to serve as "the official registry of persons of Northern Marianas descent in any and all elections . . . that requires [*sic*] only persons of Northern Marianas descent to vote in such election pursuant to the said Article XVIII, § 5 of the

---

[2] For amendments proposed by constitutional convention or by popular initiative, ratification additionally requires approval by "at least two-thirds of the votes cast in each of two senatorial districts." *Id.*

[3] The Covenant is silent on voter eligibility.

Northern Marianas Islands Constitution . . ." *Id.* § 2(c)(1). No form of NMD identification issued by an agency other than CEC may be used for purposes of voting on proposed Article XII amendments. *Id.* § 2(c)(4). To accomplish its task, CEC may require the local hospital and local courts "to provide a copy of the original birth record showing the natural parents or ancestors of the person registering. Such birth record shall identify the nationality and race of the parents, i.e. NMD Chamorro or Carolinian or part NMD, etc." *Id.* § 2(c)(5).

The Commission has promulgated rules and regulations to effectuate the purposes of P.L. 17-40. *See* 33(9) N. Mar. I. Reg. 31918 *et seq.* (Sept. 26, 2011).[4] To register for the NMDR, a person must complete a Registration Affidavit and execute an oath, under penalty of perjury, attesting that he or she is of Northern Marianas descent as defined in Article XII § 4. *Id.* at 31918, 31930. If the registration clerk believes that a person is not qualified to register, the clerk shall allow the person to fill out the affidavit but "immediately inform the Executive Director or a Commission staff person that the person attempting to register might not be eligible to register as an NMD in the Commonwealth." *Id.* The challenged registration then goes to a hearing before the Commission. *Id.*

As of the April 26 motions hearing in this matter, at least five initiatives regarding Article XII were pending in the Commonwealth legislature. (*See* Second Amended Complaint ("SAC"), ECF No. 26, § 27; Answer, ECF No. 28, § 27.) No initiative, however, had yet qualified for the next general election on November 6, 2012, and no special election to vote on an initiative was scheduled. Since the hearing, the parties have not filed any supplemental papers advising that a petition has qualified for the ballot.

---

[4] The rules and regulations and the Registration Affidavit are available online at the Commission's website, at http://www.votecnmi.gov.mp/downloads/NMDR_Regs.pdf.

It is undisputed that Plaintiff Davis is a U.S. citizen and a resident of the CNMI; that he is eligible to vote pursuant to Article VII of the Commonwealth Constitution and is a registered voter; and that he is not of Northern Marianas descent. (Opposition ("Opp."), ECF 36 at 9.) At the hearing, the parties stipulated that it would be futile for Davis to attempt to register with the Commission for the NMDR.

## III. PROCEDURAL POSTURE

On January 3, 2012, Plaintiff Davis filed his initial Complaint (ECF No. 1) and later that same day filed an Amended Complaint (ECF No. 2). Davis thereafter voluntarily dismissed Defendants Eliceo D. Cabrera and Paul A. Manglona from the lawsuit. (*See* ECF No. 9.) On March 22, the Court dismissed the Amended Complaint for lack of subject matter jurisdiction and gave Davis fourteen days in which to amend further to cure the jurisdictional deficiencies. (*See* Decision and Order, ECF No. 25.) On March 26, Davis filed a Second Amended Complaint (ECF No. 26) setting forth seven claims for relief. Prior to the motions hearing, the Court granted Defendant CEC's motion for summary judgment and dismissed CEC as not a proper defendant on any of Davis's claims. (*See* CEC Order, ECF No. 40.)

The matter is now before the Court on the remaining parties' cross-motions for summary judgment on all claims.

## IV. DISCUSSION

### A. Standing

A court must dismiss an action if at any time it determines that it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3). A "necessary component" of subject matter jurisdiction is Article III standing. *Palmdale Hills Prop., LLC v. Lehman Commer. Paper, Inc. (In re Palmdale*

*Hills Prop., LLC)*, 654 F.3d 868, 873 (9th Cir. 2011). To have constitutional standing, Davis must satisfy three conditions:

> First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations and quotation marks omitted). Clearly, the second and third conditions are present. Davis's claimed injury is directly traceable to the application of Commonwealth laws and regulations that restrict voting on Article XII initiatives. A favorable court ruling will restore his ability to vote on such matters.

The operative question is whether Davis has suffered or is about to suffer an injury in fact. As a duly registered voter, Davis has a legally protected interest in exercising his right to vote. The injury from not being permitted to vote on an Article XII initiative is concrete and particular. Because he is not of Northern Marianas descent, Article XII prohibits him from owning land in fee simple. The outcome of any vote to amend Article XII may affect his potential rights to own real property in the place he has made his home. Davis is injured if he is unlawfully deprived of the ultimate say a citizen has in political affairs: a vote.

The imminence of such a ballot initiative is suggested by the Commonwealth's own recent preparations for an Article XII vote by passing P.L. 17-40 and by promulgating and effectuating regulations to register persons of Northern Marianas descent.[5] The Commission's

---

[5] While the government may put the NMD registry to additional uses, its primary purpose is to register NMDs to vote. Creation and maintenance of the registry were placed in the hands of the

regulations require that a person applying to register swear upon penalty of perjury that he or she is of Northern Marianas descent. Thus, Commonwealth officials today are requiring otherwise qualified NMD voters to take affirmative steps to secure their right to vote on Article XII initiatives.

Still, it is not clear that the inability of non-NMDs to register is an injury in fact. If Davis were to prevail on the merits of this case, the Court would not order the Commission to let him register as an NMD, but would declare that he does not have to register as an NMD in order to vote. Because Davis is already registered to vote, he would not have to take any action to benefit from the ruling, other than to show up at the polls and cast a ballot if he so chooses. The injury would only occur, if ever, on the date of the election.

The analysis might be different with a different plaintiff. Organizations that mobilize to register minority voters may suffer an injury in fact if the allegedly unlawful restrictions on registration impair their ability to allocate resources for registration drives and to educate prospective voters. *See, e.g. Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1165–66 (11th Cir. 2008); *cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363 (drain on nonprofit corporation's limited resources caused by realty company's unlawful housing practices created injury in fact). Davis, however, is not hampered prior to the actual balloting. He may participate fully in any campaign to change Article XII. The Commonwealth laws at issue in this case do not impair his right to speak out on Article XII, to contribute his time and money to efforts to defeat or pass an Article XII initiative, or even to sign a petition to put an initiative on the ballot.

---

commission that conducts elections. The Commission's regulations state explicitly, "An NMD *registers to vote* by completing the affidavit . . . and providing all of the information as required by law, and executing same under the penalty of perjury." 33(9) N. Mar. I. Reg. 031918 (Sept. 26, 2011).

*See* "Validity of a signature of a person who is not of Northern Marianas Descent on a popular initiative petition proposing to amend Art. XII of the Commonwealth Constitution," A.G. Legal Opinion No. 2012-02, 34(4) N. Mar. I. Reg. 032404 (Apr. 29, 2012).

Davis's injury is not actual, because it does not occur until he is denied the right to vote or his ballot is disallowed. It is not imminent, because no petition is on the November ballot. Davis therefore cannot show an injury in fact, and lacks standing.

B.    Ripeness

The inquiry is incomplete, however, without discussion of a jurisdictional issue closely related to injury in fact: namely, ripeness. Even if Davis's injury were imminent so as to satisfy the requirements of standing, the court must nevertheless decline to exercise jurisdiction if the matter is not ripe for review. Ripeness doctrine "is both drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 808 (2003) (internal quotation marks omitted). Ripeness is "peculiarly a question of timing . . ." *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 140 (1974). A claim is "not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all[,]" or if it is "too speculative whether the problem [plaintiff] presents will ever need solving." *Texas v. United States,* 523 U.S. 296, 300, 302 (U.S. 1998) (internal citation omitted). However, "[w]here the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Regional Rail,* 419 U.S. at 143. Where, as here, plaintiff is asking the court to declare his rights under the law, Article III "requires that there be a 'substantial controversy . . . of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment.'" *Aydin Corp. v. Union of India*, 940 F.2d 527, 528 (9th Cir. 1991) (original emphasis) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

By its emphasis on the contingency or speculativeness of plaintiff's injury, the ripeness inquiry "overlaps with the 'injury in fact' analysis for Article III standing." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010). The two inquiries are "largely the same[.]" *Id.* The distinction is that while injury in fact, as a component of standing, focuses on "*who* is a proper party to litigate a particular matter, ripeness addresses *when* that litigation may occur." *Lee v. Oregon*, 107 F.3d 1382, 1387 (9th Cir. 1997) (original emphasis). In particular, ripeness is at issue when a party seeks pre-enforcement review of a statute or regulation. *Id.* If the injury in fact is "certainly impending, that is enough." *Regional Rail*, 419 U.S. at 143.

To determine ripeness, a court must evaluate (1) the "fitness of the issues for judicial decision" and (2) the "hardship to the parties of withholding court consideration." *Texas v. United States*, 523 U.S. at 301 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)). A matter is fit if it presents a "purely legal" issue. *Abbott Laboratories*, 387 U.S. at 149. The court should consider, however, whether "[t]he operation of the statute is better grasped when viewed in light of a particular application." *Id.* at 301. A case may not be ripe if the court "would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).

The issues in this case are fit for judicial decision. They deal almost exclusively with questions of constitutional law. The established facts, that Davis is a duly registered voter who is not of Northern Marianas descent, are sufficient to grasp that if Davis tries to vote on an Article XII initiative, he will either be prevented from voting or, having somehow managed to cast a

vote, his ballot could be invalidated. Further development of the record, as may occur through the passage of time, is not necessary.

As to hardship, defendants assert that Davis's claim is not ripe because no initiatives to amend Article XII have yet qualified for the ballot. The contingent future event – a popular vote on a ballot initiative – may not occur as anticipated, in this election cycle, and indeed may never occur at all. Until a petition is certified, "Plaintiff's frustration is entirely based on a hypothetical situation." (Opp. at 17.)

This argument has merit. As likely as it seems that in the not-too-distant future an Article XII initiative will be put to a vote, it cannot be said that a ballot initiative is inevitable. In *Regional Rail,* a takings challenge to a congressional act that would, at an indeterminate date in the future, consolidate private rail properties was ripe because "the implementation of the Rail Act will now lead *inexorably* to the final conveyance . . ." *Regional Rail*, 419 U.S. at 140 (emphasis added). In contrast, no constitutional or statutory provision requires the people of the CNMI ever to vote on modifying or repealing Article XII. While Davis may find it distressing to contemplate that under Commonwealth law, if an Article XII initiative gets on the ballot he will not be permitted to vote on it, he suffers no hardship until an initiative is "certainly impending."

It is now barely more than four months before the November general election. The thirty-day window for presenting Article XII petitions to the Commission is about to open, and close. If a petition is presented, Davis will surely have standing and the matter will be ripe for adjudication.

///

//

/

## V. CONCLUSION

For the foregoing reasons, the Court dismisses this case for lack of subject matter jurisdiction. The cross-motions for summary judgment are, therefore, mooted. The dismissal is without prejudice, as the Court has not reached the merits.

SO ORDERED this 26th day of June, 2012.

RAMONA V. MANGLONA
Chief Judge